HERAL *v.* McCABE.

HUSBAND AND WIFE — MARRIED WOMEN — SERVICES — ACTION — PARTIES.

   The legal presumption that the wife's services are employed for the husband's benefit applies to persons contracting with the husband for the services of his wife, who may not recover for her labor in her own name, unless the defendant understood that she was emancipated and expected compensation.

Error to Ionia; Davis, J. Submitted June 17, 1912. (Docket No. 114.) Decided July 22, 1912.

Assumpsit by Julia Heral against John J. McCabe for work and labor. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*William M. Smith*, for appellant.

*Scully & Davis*, for appellee.

MOORE, C. J. The plaintiff was a washerwoman living in Hubbardston, Ionia county. Defendant is the priest of the Catholic Church at that place, and plaintiff claims she was hired by him in May, 1901, to wash and iron the altar linens, surplices, priest's robes, boys' robes, towels, napkins, etc., used in the church; that she washed and ironed those articles sometimes once a week, sometimes more often, and sometimes a little less often, from the time she began doing the work until she was forced to give it up by reason of ill health in July, 1909. She claims she was hired by the priest to do this work without specification as to what her compensation would be, but that the woman who had done the same work before had received $25 per year, and that said amount was what she expected she would be paid. She claims the priest is liable to her for

whatever she earned, and that he never paid her. Some time in the late winter or early spring of 1910, she wrote the priest, or caused to be written, a letter asking for her pay for this work. She was not paid, and began this suit by declaration filed April 27, 1911. The declaration is on the common counts with a special count setting up the hiring and the work done, etc. A bill of particulars was filed. Defendant filed a plea of the general issue, and notice of payment and of the statute of limitations.

At the close of the plaintiff's case the defendant demurred to the evidence, and moved the court to direct a verdict for the defendant for substantially the following reasons:

(1) For the reason that plaintiff was a married woman, and her services belonged to her husband, and she could not sue for them.

(2) For the reason that, under the testimony, defendant was not the proper party defendant, even if the plaintiff had the right to sue. .

The court granted the defendant's requests and directed a verdict in favor of the defendant at the close of the plaintiff's case. Judgment for defendant was thereupon entered on the verdict.

Plaintiff has brought the case to this court upon error, claiming that the court erred in the following particulars:

(1) That the court erred in holding and directing the jury that, under the testimony in the case, plaintiff had no right to bring suit.

(2) That the court erred in holding and directing the jury that, even though the plaintiff was the proper party plaintiff, said defendant was not liable under the testimony in this case.

(3) That the court erred in admitting certain evidence, and in excluding other evidence.

Under proposition 1, it is argued that—

"A married woman has, under certain circumstances, the right to sue for, collect, and have her own earnings in this State."

Appellee does not question this proposition, but says it is not applicable to this case. Upon this proposition it is necessary to consider the testimony offered on the part of plaintiff, who is a married woman living with her husband during all of the time the service was rendered.

The husband of plaintiff had been in the employ of the priest who preceded defendant, and of the congregation. He looked after the church, did work for the priest, and had charge of the cemetery connected with the church. He was sworn as a witness for the plaintiff. His testimony as to the hiring is as follows:

"*A.* Father McCabe came to Hubbardston right after the other priest died, two or three weeks after, I think. At the time Father McCabe came there, Mrs. Sarah Burke in Hubbardston was doing the washing that my wife afterwards did. Mrs. Burke continued to do the washing nearly three months after Father McCabe came there to Hubbardston.

"*Q.* Did Father McCabe hire you to do work in connection with the church?

"*A.* He wanted to hire me after the 1st of March after he took charge; I refused to hire with him by the year. I did do the work, but I only done it until he could get another man at that time. It was about the 1st of March that I began. Father McCabe came to me at one time to say something to me about getting Mrs. Heral to do some washing; the Sister had found fault all winter before Father McCabe came; after Father McCabe came there, he and I were standing together, he was giving me some orders about work, we stood at the bottom of the church steps; the Sister came to the front door, and she says, 'Father, I can't get this woman,' she says, 'to do our work right; she won't do it as I want her to do it.' 'Well,' he says, 'if she won't do it we will try to get somebody that will.' And he turned around to me and he says, 'Would your wife do it?' I says, 'I heard my wife say she had all of the washing at present she could handle.' 'Well,' he says, 'you ask her and see if she will do it.' I said I would; so when I went home to dinner I asked her. Well, she said she would take a couple of washings on trial, and if she suited, she would do the washing, so when I took the two washings back to the church I asked the Sister if the washing was satisfactory.

She said, 'Yes, all they required.' Then I went to Father McCabe and told him what the Sister had said; he said that was all right and that was all the talk him and I had about the washing."

Further testimony of this witness may be helpful. We quote further:

"I was working for the parish when Father McCabe came there. I worked along for quite a little while, then Father McCabe wanted to hire me by the year first, and I wouldn't hire, I refused him; I supposed to work by the day, and he asked me if I would stay until he could get a man. I told him I would stay there; I stayed right along; I continued to work right along, continued to work for four years.

"Q. How long had he been there before you made this bargain to work by the year?

"A. Four years very nearly.

"Q. You claim you were there four years before you made a bargain with him?

"A. Before I knew what I was getting, yes, sir, I claim it.

"Q. How much did he tell you you were getting?

"A. $200 a year with the privileges in the cemetery.

"Q. Then, as a matter of fact, you had been there four years before you made any bargain with Father McCabe with reference to compensation?

"A. Yes, sir; I didn't calculate to stay there at that time, when he got a man I calculated— Yes, he paid me money right along. I kept track of it from the time he came there. Yes, sir, sometimes I would get $5 every couple of weeks; sometimes it would be $10; sometimes it would run 5 weeks and get $5, and so on; yes, sir, I have got higher than $10 at any time; when I asked him— I think I got $25 at one time; the first year I worked there I got, he paid me when the year was up, that he called me at— He called me $150; when the year was up he had $50 more, he said that was mine; he didn't say I was working for $200 a year then; he gave me $200, but he didn't say that was my salary.

"Q. The work you had agreed upon to do for Father McCabe at the end of the year you supposed you were getting $150?

"A. No, I didn't suppose any such thing.

"*Q.* At the end of the first year you supposed you were getting $150 a year ?

"*A.* No, sir; I didn't know anything about what I was getting that first year. I said Father McCabe paid me through the first year $150 to live on, then, at the end of the year, he paid me enough to make it $200; he handed it to me and said it is mine, that is all he said. Up to that time I never had any definite talk about how much I was getting; when he called it, the fourth year when he called—

"*Q.* Just a minute. Up to the end of the first year you never had had any talk with him about just how much you were to have, but he paid you $150 and then $50 more ?

"*A.* Yes, sir. I went to the end of the second year doing the same work; he paid me up to the time he called his church matters $180 during the year; he didn't pay me the balance to make up $200 when the year was up. He didn't pay me that until I quit; we never had a settlement.

"*Q.* I understand during the first year Father McCabe was there there wasn't anything said about compensation, the amount of it, until the end of the year, between you and him ?

"*A.* No, there was nothing said about the wages, about the price.

"*Q.* During the year he had paid you $150 along at different times, then when the year was up he handed you $50 more ?

"*A.* Yes, sir.

"*Q.* And asked you if that was satisfactory and you said it was ?

"*A.* No, sir; there wasn't anything said, he said it belonged to me and I took it; it was mine.

"*Q.* You made no objection then ?

"*A.* No, sir; I took the $50.

"*Q.* You made no claim for any more at that time ?

"*A.* No, sir; I didn't at that time.

"*Q.* During that year now this $200 was paid on, your wife was doing the washing ?

"*A.* Part of that year, yes, sir.  *  *  *

"*Q.* You went along through the second year, which of course you claim would be 1902, after you got this $200 the first year you went along in 1902 and Father McCabe

paid you occasionally on your work and nothing said about the price during that year?

"*A.* No, sir; nothing said.

"*Q.* When you wanted any money you asked for it and he gave it to you?

"*A.* Yes, sir. Sometimes he would hand me some money, run four or five weeks and hand me some money without asking, $5 or $10 or something like that. When I asked for money he always handed it to me; we had no trouble up to then.

"*Q.* At the end of that year he paid you how much?

"*A.* During the year up to the time he gave out his clerk's report he paid me I think $180. He owed me $20.

"*Q.* To go back to the first year, when you settled up with him the first year and he paid you $200, did you present a bill to him for $5 you had earned before he came there?

"*A.* It was before the settlement at all—I didn't have no settlement before he paid me—that $5 came in when we looked over the cemetery figures. There was nobody there to give any account of it but me. He paid me that; that was outside of the $200; had nothing at all to do with it.   *   *   *

"*Q.* The second year you went along and did the same work there you had been doing the first year, your wife did the washing the same, he paid you along during that year and nothing said about the price; at the end of that year he paid you $180 and owed you $20 on that year?

"*A.* Yes, sir.

"*Q.* Any talk about that money at that time?

"*A.* No, sir; no trouble at all. The third year went along the same way, he would pay me whenever I wanted money, or when he felt like giving it to me; he owed me $30 at the end of the third year; no dispute or trouble over it. At the end of the fourth year he owed me $43 about. He paid me the fourth year $157 for the year; he paid me at the rate, and that is what he paid me through the year. He called that out when he called out his reports.

"*Q.* When he made his reports it appeared he hadn't paid you in full?

"*A.* Yes, sir; there was no dispute about that; it was all right. I didn't have any settlement with him at the end of each year, it ran along, that is the way it went from year to year until 1909—I think it was 1909 when I

quit—eight years was what he settled up with me for; you can figure it for yourself. During all of the time Father McCabe and I had no trouble; everything was pleasant until the last year or so. * * * In 1909, March, I quit, will be two years this March coming since I quit him and we had a settlement. * * * Some time before I told him I was going to quit he had another man by the name of Hanley. I met him down in O'Brien's hardware store, and told him I was going to quit, I didn't feel very well. I asked him if he would be at home the next day for settling up, and he said for anything he knew he would, so I went up. We didn't have any words at O'Brien's store. * * *

"*Q*. He asked you then if you had your account?

"*A*. He did.

"*Q*. What did you tell him ?

"*A*. I told him I hadn't from the time my wife was sick, that the account I kept for the money that was owing had got lost. * * *

"*Q*. Then Father McCabe said to you, ' Mr. Heral, this is very unsatisfactory way to do business for you to come here to settle a long account and have to rely entirely upon me,' didn't he ?

"*A*. Well, he did, he said he would rather I had a book with me. He said it was very unsatisfactory for a man to come and settle a running account and didn't have a statement of what work he did or how much money he had received. He said that; yes, sir. * * *

"*Q*. Finally Father McCabe figured up his books and he told you according to the books he owed you $39 and some cents ?

"*A*. $35.

"*Q*. All right, $35. Now he asked you if that was all satisfactory, didn't he ?

"*A*. He did.

"*Q*. You said that was all satisfactory ?

"*A*. Yes, sir; all satisfactory. * * *

"*Q*. Didn't he give you $50 ?

"*A*. He gave me $50, but that is not the remark; he said, ' Now, Mr. Heral, wasn't there some work back from the one ahead of me coming,' he says, ' you never settled up for ?' * * * Father McCabe said, ' How much do you want, how much will you call it ?' ' Now,' I says, ' Father, look here, this has run a good while; I don't know what to call it;' so we stayed there and talked

over it a little while. 'Now,' he says, 'well, I make a motion.' I says, 'Yes, I will abide by what you say.' He says, 'How would $15 be?' He sets right there, he said $15, he says. I says, 'I will take it, it has gone so far, and square up the books.' That is how I came to take the $50. I did say that was all satisfactory and took it. * * * Father McCabe said if there was anything else he wanted it included, so he spoke about the old account that was never paid and gave me $15; he was the one to settle it. I said everything was perfectly satisfactory, and I left the office satisfied. I don't remember there was any more conversations between me and him.

"*Q.* You never said a word about the washing?

"*A.* No, sir.

"*Q.* Nor he to you?

"*A.* No, sir; I didn't do the washing; I didn't say anything about it.

"*Q.* Now answer the question. You are a speechmaker. I asked you if there was anything said about the washing?

"*A.* No, sir.

"*Q.* You said nothing?

"*A.* Nor he said nothing.

"*Q.* You knew during all of these different years there wasn't a word said about this washing only what you stated yesterday?

"*A.* That is all the words we ever had. He sent me there to hire just the same as he would send anybody to her."

The plaintiff, though a willing witness, testified she had no talk with the defendant about doing the washing. The defendant was called as a witness by the plaintiff and testified in part as follows:

"*Q.* Do you recall sending Mr. Heral to his wife to see whether she would do washing in 1902 or thereabouts?

"*A.* Yes, sir; not sent to his wife, asked him if his wife would do it.

"*Q.* Didn't he then state to you in substance he would go to see her and ask her whether she would not?

"*A.* He answered me promptly she would do it; he didn't say he would go and ask her. From that time forward I never have had any talk whatever from the time she started to do the washing with him or with her specially with reference to that particular washing."

We have quoted all the testimony in relation to the hiring of the plaintiff to do the washing. It will be noticed that it nowhere gives rise to the inference that defendant was dealing with the plaintiff expecting that he was to pay her. It is shown beyond any question that the work she did was upon linen that was used in the church service.

At the close of the testimony after a full argument by counsel, the following occurred: The trial judge said:

"No claim was ever made until nearly time suit was brought after the settlement had been made with the husband for the eight years' work; and he at the time he made that settlement was entitled to the services of his wife unless he had relinquished them. * . * * Under the testimony in this case, and under the law, it belonged to the husband when he settled his account; it was then too late to relinquish it to the wife and must be presumed in law to have been settled by the husband. So far as the second proposition in the case is concerned, I deem it hardly necessary to pass upon it. I think this disposes of the entire question, so, gentlemen, you will render a verdict—

"*Mr. Smith:* Suppose in the event of a possible retrial of this case, wouldn't your honor assume to pass upon this other proposition so the upper court might pass upon them both?

"*The Court:* If the counsel want the benefit of my opinion, I will give it upon that proposition.

"*Mr. Smith:* I would be glad to have it, your honor.

"*The Court:* The court finds in this case as to the second proposition that from the testimony it does not appear that the defendant, John J. McCabe, in contracting with the husband, intended to bind himself. He asked if the washing could be done by his wife. The husband knew to whom the washing belonged and for whose benefit it was. He himself was a member of the very congregation and in law was liable for the doing of the washing. The priest had no personal interest in it. He knew it had been the habit of the priest to report this amount of washing as expenses incident to be paid by the church. Under those circumstances, there was no understanding on the part of the pastor that he become personally liable, or that he knew it was done in reference to any intended charge

against himself; that whatever he-did was done as the agent of the church, and that that fact was known to the other party, and that the statute, section 10025, gives to the plaintiff, if she had any right to recover against anybody, the clear right to have brought her action against the church. That is my opinion as to the law."

In *Mason* v. *Dunbar*, 43 Mich. 407 (5 N. W. 432, 38 Am. Rep. 201), Justice COOLEY, speaking for the court, said:

"The plaintiff claims that her husband and herself alternately took charge of the husband's father, who in his extreme old age was blind and imbecile, and required constant care and supervision day and night, and that it was distinctly agreed between herself and her husband that for her own services she should receive compensation from the father. If such was the fact, and if the father understood the arrangement and assented to it, the court is of the opinion that she would be entitled to recover what would be just and reasonable. The husband had the right to give her for this purpose her services, or to refuse to give them at his option, and, if he made the gift, the legal right to deal with the father as a stranger might would follow:

"But we are all of opinion that the father must have been made aware of the arrangement, and must expressly or by implication have assented to it before he could have been chargeable with any legal claim in plaintiff's favor. The legal presumption is that the wife is employing her services in her husband's interest; and where she is working with her husband, as was the case here, a great wrong would sometimes be done if each might present and recover upon separate claims, when the other party supposed and had a right to suppose he was dealing with the husband alone. It is not enough to show that the husband has given the wife her services, but the other party must also understand that contract relations between himself and the wife exist and that the wife expects compensation."

While we have had many decisions bearing upon the right of a married woman to recover for services rendered by her, we have not had our attention called to any that changes the rule stated above. See *Barnes* v. *Moore Estate*, 86 Mich. 585 (49 N. W. 585).

There is not a particle of evidence in the case from which the inference can be fairly drawn that the defendant understood that he was dealing with the plaintiff and that he was to pay her for her services. Having reached this conclusion, the other questions become unimportant.

The judgment is affirmed.

STEERE, MCALVAY, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred. BLAIR, J., did not sit.